CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 07 2012

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **JACORI ANDRÉ CARTER,** | ) CASE NO. 7:12CV00008 |
| **Plaintiff,** | ) |
| | ) MEMORANDUM OPINION |
| vs. | ) |
| | ) |
| **D. FARMER, ET AL.,** | ) By: Glen E. Conrad |
| | ) Chief United States District Judge |
| **Defendants.** | ) |

Jacori André Carter, proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, in the United States District Court for the Eastern District of Virginia, raising several claims. Under 28 U.S.C. § 1915A(b)(1), the Court summarily dismissed Carter's claims alleging deliberate indifference to medical needs, denial of due process related to the grievance procedure and confiscation of property, and verbal abuse. (DE 16.) The Court then directed three defendants, Officers Farmer, Hall, and Gilbert, to answer Carter's claim of excessive force. Thereafter, the Court transferred the case, as the cause of action arose in this district. Carter then engaged in discovery and responded to defendants' motion for summary judgment. Upon review of the record, the court grants defendants' motion.

I

A. Carter's Evidence[1]

Stated in the light most favorable to Carter as the nonmoving party, plaintiff offers the following evidence relevant to his claims. Carter was confined at Red Onion State Prison at the time of the events at issue in July 2010. The defendants, D. Farmer, J. Hall, and Sergeant Gilbert, were corrections officers at Red Onion. On July 22, 2010, Farmer and Hall were taking

---

[1] Carter sets out his evidence in his verified complaint (DE 1, 1-20.) and attachments, his affidavit and supplemental affidavit and exhibits (DE 43), and the surveillance camera footage from the vestibule and the pod.

Carter off the recreation yard to escort him back to Housing Unit 4. Carter's hands were handcuffed behind his back, and he had shackles around his ankles. At the door to Carter's cell, Hall ordered Carter to give him the stamps Carter had in his hand. Carter said, "No." Hall "slung" Carter into the cell, "slammed [his] head into the wall, grab[bed] a handful of [Carter's shoulder length] hair, . . . and started kneeing [him] in the right side of the face . . . about 3 or 4 times." (DE 43, p. 2.) Officer Farmer did nothing to prevent Hall's actions. Sgt. Gilbert arrived with a camcorder and told Carter to stop resisting, although the officers had Carter pinned in the corner of his cell with his head almost between his legs and his arms pulled up behind him, making it impossible for him to resist.

Carter told Gilbert several times that Hall had assaulted him. Gilbert told Carter to "calm down," give up the stamps, and walk over to the door so the officers could remove the restraints. (DE 43, p. 3.) Carter refused to be moved and asked to see a higher ranking officer and a nurse. Gilbert radioed Nurse Tate, and she came to examine Carter's head. Tate stated on camera that she saw no injuries, but also said that it was too early to know if there would be any swelling. Carter told Tate that he was having trouble breathing and needed his inhaler.

Carter continued to refuse to comply with orders to turn over the stamps and walk to the cell door. Gilbert radioed Lt. Fleming.[2] When Fleming arrived, Carter told him several times that Hall had assaulted him. Fleming ordered Carter to give the stamps to the officers and said that if he failed to do so, the officers would place him in ambulatory restraints. Carter refused to turn over the stamps. Fleming ordered the officers to escort Carter to the vestibule. Carter said he feared for his life and refused to walk down the steps from the top tier to the lower tier of the pod. Fleming told the officers to take Carter down the stairs, which they did.

---

[2] Carter refers to this officer as "Lt. Flemmings." The court, however, will use the name that this officer used on his affidavit and supplemental affidavit: Lt. Fleming. (DE 30-4; DE 40-2.)

2

In the vestibule, the officers had Carter kneel in front of the wall. Fleming told Carter that he was going to use pressure points on Carter's head in order to force him to give up the stamps. Fleming got behind Carter and pressed "his thumbs into both sides of [Carter's] ears while smashing [his] face into the wall and squeezing [his] neck," while Hall and Farmer tried to "break [Carter's] hand open" to retrieve the stamps. (DE 43, p. 7.) Even after Carter released the stamps, Fleming continued squeezing Carter's neck until he "was about ready to pass out." (DE 43, p. 7.) Fleming then ordered that Carter be placed in ambulatory restraints for being disruptive and failing to turn over the stamps as ordered. Carter told Gilbert that the leg restraints were cutting into his legs and wrists. Gilbert had a nurse check the restraints while Carter was on his knees. Carter tried to explain to the nurse that the restraints would be too tight once he stood up to walk, but the nurse said the restraints were OK. Officials released Carter from ambulatory restraints just after noon on July 24, 2010.

Officials charged Carter with two disciplinary infractions related to the events of July 22, 2010: possession of contraband and disobeying a direct order. In separate proceedings, the hearing officer found Carter guilty of both offenses and penalized him with 30 days loss of telephone privileges for each offense.

As evidence of his injuries, Carter attaches to his affidavit a page from his medical records for July 2010. (DE 43-7.) After examining Carter in his cell, Nurse Tate noted that Carter complained of "swelling in [right] temple area. No swelling or bruising noted to face or head, no open areas or active bleeding noted, no other injuries noted to face or head. Instructed [inmate] of findings and to follow up [with] medical if needed." (DE 43-7.) The nurse who examined Carter after the officers applied ambulatory restraints reported that she could place two fingers under each restraint and that a pulse was present; noting that Carter complained about his

3

right ankle and the right side of his head, the nurse stated that there was "[n]o active bleeding [or] discoloration." (DE 43-7.) After officers removed ambulatory restraints on July 24, 2010, although Carter complained of injuries to both wrists and ankles, the nurse reported: "superficial scrape noted on both wrists. No injuries noted to ankles. Both wrists are slightly swollen. Instructed [inmate] to clean both wrists [with] soap & [water]. No further [treatment] necessary." (DE 43-7.)

### B. Defendants' Evidence[3]

The defendants assert that Red Onion is an administrative segregation facility that houses inmates who are classified as the highest security risks, including some of the most violent offenders incarcerated in the Virginia Department of Corrections ("VDOC"). Officials apply maximum security supervision at all times over these inmates to maintain control, prevent escape, minimize risk of staff and inmate injury, and ensure the safe and orderly operation of the prison.

While Carter was in the recreation cage on July 22, 2010, Officer Hall saw him receive an envelope through the recreation cage from another inmate. (DE 30-2, ¶4; DE 30-4, ¶6.) Because Carter received the item from another inmate and was not authorized to possess the item in the recreation yard, the envelope was considered contraband. (DE 30-4, p. 21.) At about 2:55 p.m., when Hall and Farmer escorted Carter from the recreation area back to his cell, the officers did not know what was in the envelope in Carter's hand and had to be cautious, because it could have contained a weapon or some other prohibited object. (DE 30-2, ¶4.) Only later, after confiscating the envelope, did the officers discover that the envelope contained postage stamps.

---

[3] In support of their motion for summary judgment, defendants present affidavits by Farmer, Hall, Sgt. Gilbert, and Lt. Fleming, with attachments. (DE 30.)

4

During the escort, Carter became verbally abusive and upset. At the door to Carter's cell, Hall ordered Carter to turn over the envelope, and Carter refused. Hall told Carter he would perform a frisk search, and Carter violently jerked away and pulled Farmer and Hall into the cell.[4] (DE 30-2, ¶5; DE 30-3, ¶5.) Because of Carter's behavior, the officers placed Carter first against the left wall inside his cell and then, because he continued to resist, against the right wall to regain control over him. Carter complained that he was dizzy and was going to pass out. To prevent Carter from injuring himself, Farmer and Hall placed Carter on his stomach on the floor. When he then complained that he could not breathe, they moved him to his knees and maintained control over him there.

Hall denies that he pulled Carter's hair or kneed Carter in the face at any time, and Farmer and Gilbert state that they did not see Hall do so. Both officers also deny that they slammed Carter's head into the wall, and Farmer states that in the vestibule, Carter slammed his own head into the wall.

When Sgt. Gilbert arrived at the cell, he saw Hall and Farmer using appropriate control techniques to hold Carter against the wall of his cell. After Carter failed to comply with orders from Gilbert and Lt. Fleming to release the envelope, Fleming ordered ambulatory restraints. Carter also refused to comply with orders directing him to walk down the stairs. In the vestibule, with Carter on his knees to minimize his leverage and allow the officers to control his movements more easily, Fleming again ordered Carter several times to give up the envelope. Carter failed to comply. Because the officers did not know what was in the envelope and Carter refused to cooperate and give the envelope to the officers, they "had to take all precautions for the officers' safety and the inmate's safety while securing the contraband, . . . [which] could have

---

[4] Carter denies that Hall tried to frisk him and denies that he ever "pulled [or] turned towards the officer in an aggressive manner." (DE. 43, p. 5.)

5

contained a weapon." (DE 30-4, ¶6.) Fleming "utilized a pressure points technique behind [Carter's] ears and under his jaw as a pain and compliance technique," a control VDOC officers use "to cause an inmate to comply with what has been ordered." (DE 30-4, ¶7-8.) At this point, Farmer retrieved the envelope from Carter's hands. The officers then removed Carter's clothing, conducted a visual strip search for contraband, provided him a safety smock, and placed him in ambulatory restraints.

## II

### A. Standard of Review

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Although the court must view genuinely disputed facts in the light most favorable to the nonmovant, the court "need not accept the legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir. 2006) (omitting quotation). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of

6

ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007) (omitting internal quotations, alterations, and citations).

### B. The Video Evidence

After defendants reported during discovery that the camcorder footage and any still photographs from July 22, 2010 were no longer available, the Hon. Robert S. Ballou, United States Magistrate Judge, noted that plaintiff could "assert[ ] a spoliation claim regarding the loss of any video and/or photographs of the July 22, 2010 incident should the facts and law so allow." (DE 44, p. 1.) In response to defendants' motion, Carter argues that the handheld camera footage, if available, would show Fleming utilizing pressure points on Carter's head, squeezing his neck, and smashing his face into the wall. (DE 43, p. 7.) The court construes this reference to the camcorder footage as Carter's attempt to raise a spoliation claim.

"Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995). Such "[a]n adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." Id. at 156.

Defendants' evidence is that on July 22, 2010, Sgt. Gilbert was using the video recorder to film events involving another inmate in Carter's housing unit when he was called to Carter's cell to record; records show that Gilbert then "began video recording when he arrived at Carter's cell and while Carter was placed in ambulatory restraints." (DE 40-2, ¶3.) The video recorder used to film Carter's incident stored the footage on a hard drive. From the hard drive, the footage of Carter's incident was "downloaded with the footage of the other offender into the

7

same folder in the computer. This footage was inadvertently erased from the computer with no means to recover it." (DE 40-2, ¶¶4-5.)

Carter offers no evidence that the loss of the video resulted from anything other than inadvertent oversight, before Carter filed his lawsuit in September 2011.[5] Moreover, the officers' use of force in Carter's cell occurred before Gilbert arrived with the camcorder, and the other uses of force are depicted in the available Rapid Eye footage of the pod and the vestibule. Therefore, the court finds no valid spoliation claim regarding the loss of the camcorder footage. Vodusek, 71 F.3d at 156.

In response to defendants' motion, Carter also asserts that he never received any contraband from another offender on the recreation yard on July 22, 2010, and contends that surveillance camera footage of the rec yard would prove this fact. (DE 43, p. 5-6,) In response to the court's order to provide all available video footage related to the July 22, 2010 incident, the defendants submitted only footage of the pod and the vestibule, not the rec yard. Although defendants have not explained why they did not provide the rec yard footage, the court finds no need to require further development of this evidentiary issue. Whether Carter received the stamps from another inmate is not a material dispute of fact. The record establishes that the stamps were contraband under prison policy, because inmates are not authorized to possess stamps on the recreation yard, and Carter admits that he had stamps on the rec yard.[6] Therefore,

---

[5] Carter argues that the Rapid Eye video of events in the vestibule on July 22, 2010, shows Lt. Fleming, rather than Sgt. Gilbert, filming the placement of the ambulatory restraints, proving that Fleming "lied" about who was last in possession of the video camera. (DE 43-1, ¶2.) This discrepancy is immaterial to the spoliation issue, however, in the face of defendants' evidence that inadvertent actions caused the loss of the video footage.

[6] Carter argued at his disciplinary hearing that postage stamps cannot be contraband, since inmates can purchase them at the commissary. (DE 30-4, p. 18.) The hearing officer found that the stamps were contraband because Carter could not prove that he had procured the stamps in accordance

8

the manner in which Carter received the stamps is immaterial to a finding that he possessed contraband. Carter does not present any other respect in which the rec yard footage would support his claims that the officers used excessive force against him in his cell and in applying ambulatory restraints in the vestibule.

### C. Excessive Force

The Eighth Amendment does not prohibit all application of force or infliction of pain against prisoners. United States v. Gore, 592 F.3d 489, 494 (4th Cir. 2010). "[O]nly the unnecessary and wanton infliction of pain" rises to the level of a constitutional violation. Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175 (2010). When an inmate claims officers used excessive force against him, the court asks two questions: whether a specific prison official "acted with a sufficiently culpable state of mind and [whether] the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8 (omitting internal quotations).

In applying the subjective component under Hudson, the court asks whether officials applied force "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm" Id. at 7 (quoting Whitley, 475 U.S. at 320-21). The court must "focus on whether the evidence supports the inference that the guards wantonly punished" the inmate, and not on whether their actions were "necessary" in the court's eyes. Whitley, 475 U.S. at 319, 322. In Whitley, the Supreme Court recognized that relevant factors to consider in this inquiry are: (1) the need for application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury, (4) the

---

with VDOC operating procedures and because he was not authorized to possess them in the recreation yard. (DE 30-4, p. 21.)

9

threat reasonably perceived by the responsible officials based on the facts known to them, and (5) any efforts made to temper the severity of a forceful response. Id. at 321. "In recognition that the prison environment is a dangerous one for correctional officers, prison administrators must be accorded 'wide-ranging deference' to design and implement policies and practices that in their judgment are necessary for the preservation of order and security." Stanley v. Hejirika, 134 F.3d 629, 634 (4th Cir. 1998) (quoting Whitley, 475 U.S. at 321-22).

In addressing the less demanding, objective component under Hudson, the court asks whether the force applied was "nontrivial." Wilkins, 130 S. Ct. at 1779. The objective inquiry is "responsive to contemporary standards of decency," and in the excessive force context, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . whether or not significant injury is evident." Hudson, 503 U.S. at 9 (emphasis added). Nevertheless, the extent of the inmate's injury is not "irrelevant" to the Eighth Amendment inquiries, as it "may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation" or may "provide some indication of the amount of force applied." Wilkins, 130 S. Ct. at 1778 (quoting Hudson, 503 U.S. at 7). As a result, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 130 S. Ct. at 1178 (quoting Hudson, 503 U.S. at 9).

### D. Discussion

Taking the relevant facts in the light most favorable to Carter, Carter's excessive force claim fails under the subjective prong of Hudson, because he fails to marshal evidence demonstrating that the officers acted with a culpable state of mind. Officers Hall and Farmer reasonably perceived Carter to present a security risk when they took him from the recreation
10

yard back to his cell on July 22, 2010. Carter had unauthorized items in an envelope on the recreation yard and carried that envelope with him back to his cell. Under prison policy, even an item that inmates can rightfully purchase at the commissary, such as a book of postage stamps, becomes contraband when an inmate acquires it from another inmate or when he possesses the item in an unauthorized area. Hall and Farmer had no way of knowing whether Carter had something more threatening than stamps in the envelope until after they confiscated the item and examined it.[7] When Hall repeatedly ordered Carter to relinquish the envelope, Carter refused, heightening the officers' reasonable belief that he might possess a threatening item. At Red Onion, working day in and day out with inmates classified as the VDOC's highest security risks, officers must take seriously and act to defuse any potential threat, even one that can fit in an envelope, and to overcome defiance before it spreads to other inmates. Thus, Carter's continued intransigence created a need for the officers to step past verbal commands and use some measure of physical force to remove the threat and restore discipline.

The court must consider Carter's version of Hall's actions inside the cell under the full circumstances that Hall faced. Slamming Carter's head into the wall, grabbing his hair, and kneeing him in the face, if Hall took such measures, were not the most professional response to the situation. Nevertheless, lack of professionalism alone does not support a reasonable inference that Hall's conduct exceeded the force allowed by the Eighth Amendment in light of Carter's prior actions. Hall applied this force in response to Carter's defiant retention of potentially dangerous contraband, despite numerous verbal orders to relinquish it.

---

[7] Carter asserts that Hall and Farmer knew the item in Carter's hand was not threatening. Carter presents no facts in support of this conclusory allegation, however. At the most, Carter claims that the written disciplinary charges prove the officers knew Carter had stamps. Since the officers wrote the charges after confiscating the envelope, however, the disciplinary charge documentation does not prove what the officers knew before the confiscation. Even if Carter told the officers he only had stamps in his hand, the envelope concealed its actual contents.

11

Moreover, Carter fails to demonstrate that Hall's use of force in the cell caused Carter anything more than minimal injury. The nature of Carter's professed injuries proves decisively that whatever force Hall applied was not a malicious, sadistic, or grossly exaggerated response to Carter's behavior. Just minutes after Hall purportedly slammed, grabbed, and kneed Carter in the head, the nurse who examined him noted no visible swelling or bruising on Carter's face and head and saw no blood or open areas. When the nurse examined him after application of the ambulatory restraints on July 22, 2010, Carter complained about his right ankle and the right side of his head, but the nurse noted no bleeding or discoloration. At the time officers removed the ambulatory restraints on July 24, 2010, the nurse noted no complaint from Carter about injuries to his head. Although instructed to contact the medical unit if necessary, Carter does not allege seeking any further treatment for injuries he suffered as a result of the officers' actions on July 22, 2010. In fact, Carter does not allege that Hall's conduct caused him pain or any other particular harm -- at the time of the alleged assault or later.[8] Commensurate with Wilkins, 130 S. Ct. at 1178, and the third factor of Whitley, 475 U.S. at 321, Carter's lack of evidence of injury indicates that the amount of force Hall applied in subduing Carter in his cell cannot be characterized as the wanton infliction of harm. The court concludes that Carter presents no triable dispute that Hall's actions in the cell violated Carter's constitutional rights.

The court's determination of no genuine dispute that Hall violated Carter's rights precludes Carter's claim against Farmer, for failing to intervene and protect him from the force Hall applied. De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks omitted) (finding that failure to protect claim requires showing (1) that official's omission

---

[8] At the most, Carter alleges that his dark skin would make bruises difficult to see. (DE 43, p. 2.) Yet, Carter does not allege that he actually developed bruises or swelling as a result of the altercation with Hall.

12

resulted in "serious or significant physical or emotional injury," and (2) that official "kn[ew] of and disregard[ed] an objectively serious . . . risk of harm." ). Carter's allegations are that Hall's actions occurred in seconds, leaving no reasonable opportunity for Farmer to have prevented or stopped them.[9] Thus, Carter cannot establish a triable issue against Farmer for deliberate indifference.

When Gilbert arrived at Carter's cell, Hall and Farmer were holding Carter in a control position, and Gilbert did not intervene. The control position, however, by Carter's own admission, did not cause anything more than temporary discomfort. The officers reasonably believed that maintaining a secure hold on Carter was warranted while he refused to give him the unidentified contraband. Carter does not dispute the officers' account that when Carter complained of dizziness and trouble breathing, they shifted his position to alleviate these problems. The court cannot find that the mere use of the control position constituted the wanton infliction of harm and, therefore, cannot find that Gilbert's failure to order Hall and Farmer to stop their actions constituted deliberate indifference to any serious risk of harm. De'Lonta, 330 F.3d at 634.

Carter complains that Gilbert did not report to Fleming that Hall had assaulted Carter. It is undisputed, however, that Gilbert did not witness Hall's alleged assault on Carter, and the inmate's claim of assault did not excuse Carter's own actions or decrease the threat they posed. From the reports of his officers and his own experience, Fleming knew all he needed to know about the situation -- that Carter possessed contraband and had refused to obey multiple orders to give it up. These facts supported Fleming's reasonable perception that Carter presented both a

---

[9] For the same reasons, Carter also cannot prove a claim of bystander liability against Farmer. See Randall v. Prince George's County, 302 F.3d 188, 203 (4th Cir. 2002) (omitting citation) (finding that bystander officer who (1) [was] confronted with a fellow officer's illegal act, (2) possesse[d] the power to prevent it, and (3) cho[se] not to act" might be deemed an accomplice) (emphasis added).

13

threat and a need for application of the amount of force necessary to obtain the contraband against Carter's will. Therefore, Gilbert's failure to immediately report the alleged assault to Fleming had no bearing on Fleming's ability to accurately assess and appropriately address the situation.

Carter states no triable issue that Fleming's use of pressure points was an inappropriate use of force under the circumstances. Fleming expressly warned Carter that if he did not give up the envelope, Fleming would apply the pressure points technique. By failing to heed this warning, Carter created the need for additional force. The pressure points maneuver caused Carter only temporary discomfort that convinced him to give up the contraband after he ignored verbal orders to do so. Carter's evidence, including the vestibule video, does not support a reasonable inference that Fleming's use of this protocol to allow retrieval of the contraband constituted a wanton infliction of harm.[10]

Fleming's order for ambulatory restraints also arose from his reasonable perception that Carter's noncompliance with prison rules and officers' orders presented a need for continued force to control him until he became compliant. This court has held that

> [i]n response to an inmate's admittedly disruptive misconduct, a temporary limitation of an inmate's access to hygiene products, bedding, eating utensils, and freedom of movement, which causes the inmate no physical injury other than temporary discomfort and embarrassment, simply cannot qualify as a use of force that is "repugnant to the conscience of mankind."

Holley v. Johnson, Case No. 7:08CV00629, 2010 WL 2640328, *14 (W.D. Va. 2010) (finding that ambulatory restraints, as a control mechanism, properly applied and maintained even for 48 hours, are "not a use of force that offends contemporary standards of decency so as to satisfy the

---

[10] The court notes that Fleming is not a defendant to Carter's complaint. Before the case was transferred, the Eastern District Court construed a letter from Carter as an amendment and granted it, adding Fleming as a defendant. (DE 6, 9.) The Court construed a later submission from Carter as a motion to rescind the amendment, however, which the Court granted. (DE 18.)

14

objective component of an excessive force claim") (citing other cases). Carter fails to demonstrate that the ambulatory restraints caused him anything more than temporary discomfort. When Carter told Gilbert the restraints were too tight, Gilbert had a nurse check them and rightfully relied on her assessment that the restraints posed no risk of physical harm to Carter. See Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (finding that prison personnel may rely on medical staff as to inmate's medical needs). Although Carter reported pain in his ankles and wrists when officers removed the ambulatory restraints, the nurse saw only minor scrapes and swelling and recommended soap and water as the only necessary treatment. Carter did not complain further about these injuries. The court cannot find on this record that any of the officers wantonly inflicted harm on Carter in applying the ambulatory restraints.

Under all factors of Whitley, 475 U.S. at 320-21, no reasonable fact finder could conclude that on July 22, 2010, the officers wantonly applied force with an intent to punish Carter, as required to prove the subjective facet of his Eighth Amendment claim under Hudson.[11] 503 U.S. at 8. Rather, the evidence supports a finding that these officers, in good faith, applied the type and amount of force they believed was necessary to control a volatile situation, gain possession of the contraband from Carter, and effectively restore order and discipline. Finding no genuine issue of material fact in dispute, the court concludes that defendants are entitled to

---

[11] For the same reasons that the defendants are entitled to summary judgment on the merits of Carter's excessive force claims, they are also entitled to qualified immunity against his claims for monetary damages. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (finding that qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

summary judgment as a matter of law and grants their motion.[12] An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for defendants.

ENTER: This 7th day of September, 2012.

/s/ Glen Conrad
Chief United States District Judge

---

[12] Defendants argue that Carter's lawsuit should be dismissed as frivolous under 42 U.S.C. § 1997e(c)(1), based on his admitted possession of contraband, refusal to comply with orders, and minor injuries. They assert that Carter's lack of injury discredits his description of Hall's conduct in the cell. Although the court concludes that defendants are entitled to summary judgment, the court does not find Carter's allegations to be legally or factually frivolous so as to warrant dismissal under § 1997e(c)(1). See Neitzke v. Williams, 490 U.S. 319, 327 (1989) (recognizing court's authority under prior version of 28 U.S.C. § 1915 to summarily claims as frivolous or malicious).

16

Case 7:12-cv-00008-GEC-RSB   Document 50   Filed 09/07/12   Page 16 of 16   Pageid#: 379